Charles R. CHRISTIANSON and International Trade Services Inc., Plaintiffs–Appellees,

v.

COLT INDUSTRIES OPERATING CORP., Defendant–Appellant.

No. 88–2492.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 28, 1988.
Decided March 22, 1989.

---

John C. McNett, Woodard, Emhardt, Naughton, Moriarty & McNett, Indianapolis, Ind., for Spiro Bereveskos, Defendant–Appellant.

Anthony M. Radice, William, Brinks, Olds, Hofer, Gilson & Lione, Chicago, Ill., for Plaintiffs–Appellees.

Before CUMMINGS and FLAUM, Circuit Judges and FAIRCHILD, Senior Circuit Judge.

FLAUM, Circuit Judge.

Charles Christianson and his company, International Trade Services (together hereinafter referred to as "Christianson"), filed a two-count complaint against Colt Industries Operating Corp. ("Colt") alleging, in Count I, that Colt had illegally monopolized the market in M–16 parts and had successfully organized a group boycott of Christianson, an M–16 parts supplier, in violation of Sections 1 and 2 of the Sherman Act and Sections 4 and 16 of the Clayton Act. Count II alleged that Colt had tortiously interfered, under Illinois law, with Christianson's business opportunities.

Colt has defended the suit by claiming that any actions it took were justified by its interest in not divulging the information which would permit the parts to be used commercially in connection with the M–16, information which it claims was subject to state trade secret law protection. Colt also counterclaimed against Christianson, who was a former Colt employee, alleging breach of contract and a variety of other state and federal law trade violations based on Colt's proprietary interests in the parts. Christianson countered Colt's defense, and its counterclaims, by alleging that Colt no longer had any proprietary interest in the parts at issue since the patents on the parts had expired and Colt had no protectible trade secrets in the parts. According to Christianson, Colt could not claim any trade secret protection relating to the parts because the information Colt claimed to be subject to trade secret protection should have been included in Colt's patent disclosures for the parts. Specifically, Christianson alleged that Colt should have included the specifications and tolerances that would permit those parts to be interchangeable with all of the other M–16s ever produced.[1] Alternatively, Christianson's complaint alleges that Colt lost its proprietary interests in the parts when it granted Christianson permission to sell the parts in 1976.

Both sides filed motions for partial summary judgment. Christianson moved for a declaration that Colt's trade secrets were invalid because those secrets—the specifications and tolerances for interchangeability—should have been disclosed in the patent applications and also moved for judgment in its favor on the tortious interference count. Colt asked for a declaration that its patent disclosures were adequate and also asked for dismissal of count II, the tortious interference count.

The district court agreed that the patents were invalid for nondisclosure. The court then found, based solely on its finding of patent invalidity, that Colt had no protectible trade secrets in the parts and granted Christianson's motion for partial summary judgment and denied Colt's motion. The district court also, *sua sponte*, entered summary judgment for Christianson on both counts of the complaint.

---

1. Interchangeability refers to the ability to use a part in every M–16 currently in existence. Interchangeability is a requirement for all M–16 parts because it often becomes necessary on the battlefield to use parts from one rifle to repair another rifle. To achieve interchangeability, the parts must all be manufactured with dimensions falling within specified tolerances. If the tolerances are exceeded, the part will not be interchangeable with M–16 rifles already in existence. Thus, to successfully manufacture a marketable replacement part for the M–16, it is crucial to know those specifications and tolerances which permit interchangeability.

Colt appealed the district court's decision to the Court of Appeals for the Federal Circuit, touching off a jurisdictional exchange between the Federal Circuit and the Seventh Circuit. The Supreme Court eventually settled the jurisdictional dispute by holding that the Seventh Circuit is the proper forum for Colt's appeal. *Christianson v. Colt Industries Operating Corp.*, —— U.S. ——, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988). Finally reaching the merits of this appeal, we reverse the district court's grant of summary judgment, find that summary judgment should be entered for Colt on the issue of the adequacy of Colt's patent disclosures, and remand for further proceedings.

### I.

The basic patents which protect the M–16 were first issued to the Armalite Division of Fairchild Hiller Corporation for its "AR–10" and "AR–15" rifles. In 1959, Colt received a license from Fairchild to develop those patents and, by 1962, had successfully developed a mass-production rifle. Shortly thereafter, the United States Army adopted that rifle as its principal battlefield rifle and designated it the M–16.

Over time, Colt made improvements to various parts of the rifle and patented those improvements, although it did not always use the improvements in actual production of the rifle. Christianson contends that nine of those improvement patents,[2] five of which actually found their way into production, were invalid from conception because they failed to divulge the requisite information regarding their manufacture and use.

Charles Christianson, a former Colt employee, formed International Trade Services ("ITS") and went into business selling replacement parts for the M–16. These parts were obtained from Colt's suppliers, all of whom had previously agreed with Colt not to supply anyone other than Colt or Colt's licensees.[3] In 1976, Christianson received permission from Colt to sell replacement parts, but the parties strongly disagree about whether that permission was of a continuing or a limited nature.

Springfield Armory ("Springfield"), an Illinois corporation, also entered into the business of selling M–16 replacement parts. Those replacement parts were manufactured within tolerances permitting interchangeability of the parts with existing M–16 rifles. Colt became aware of Springfield's endeavors and, in August 1983, commenced an action based on misappropriation of trade secrets and patent infringement seeking to enjoin Springfield's activities. Springfield denied that it had misappropriated Colt's trade secrets in the specifications and tolerances necessary to make the replacement parts interchangeable with existing M–16 rifles claiming instead that it had "reverse engineered"[4] the parts. Colt contended that to reverse engineer the parts so as to make them interchangeable with every M–16 ever produced would be a "massive task" and thus the information

---

**2.** The patents at issue are: (1) Firearm Having an Auxiliary Bolt Closure Mechanism, Patent No. 3,236,155 (issued 2/22/66); (2) Trigger Mechanism, Patent No. 3,292,492 (issued 12/20/66); (3) Mechanism for Changing Rate of Automatic Fire, Patent No. 3,301,133 (issued 1/31/67); (4) Buffer Assembly Having a Plurality of Inertial Masses Acting in Delayed Sequence To Oppose Bolt Rebound, Patent No. 3,366,011 (issued 1/30/68); (5) Firearm Book Magazine with Straight End and Intermediate Arcuate Positions, Patent No. 3,440,751 (issued 4/29/69); (6) Disposable Magazine Having a Protective Cover and Follower Retaining Means, Patent No. 3,453,762 (issued 7/08/69); (7) Magazine with Anti–Double Feed Indentations in the Side Walls, Patent No. 3,619,929 (issued 11/16/71); (8) Blank Firing Adaptor for Gas Operated Firearm, Patent No. 3,766,822 (issued 10/23/73); Rifle Conversion Assembly, Patent No. 3,771,415 (issued 11/13/73).

**3.** Colt licenses various manufacturers to produce replacement parts for the M–16. The licenses allow the manufacturers to sell the parts only to Colt or to a government which has contracted with Colt for supply of M–16 rifles. Colt places proprietary legends on all drawings given to the manufacturers and expressly prohibits the manufacturers from supplying information on the parts to third parties.

**4.** Reverse engineering is the process by which a completed product is systematically broken down to its component parts to discover the properties of the product with the goal of gaining the expertise to reproduce the product.

had to have been taken from Colt's proprietary drawings. The district court agreed with Colt and granted a preliminary injunction against Springfield. Colt sent letters to its suppliers informing them of the result and reminding them of their contractual obligation to refrain from selling M–16 parts to anyone other than Colt or Colt's licensees.

In the course of discovery in the *Springfield* case, Colt learned that Christianson had been among those who supplied Springfield with M–16 parts. Colt joined Christianson and ITS as defendants in the case but, after failing to receive a preliminary injunction against them, voluntarily dismissed them from the case.

Shortly after that dismissal, on May 14, 1984, Christianson filed the instant suit against Colt claiming that Colt's actions in protecting its alleged trade secrets violated Sections 1 and 2 of the Sherman Act and Sections 4 and 16 of the Clayton Act. Although the complaint was inartfully drawn, it apparently alleged that Colt—through its restrictive agreements with suppliers, the bad faith joinder of Christianson in the *Springfield* case, the letters Colt subsequently sent to suppliers informing them of the outcome of the *Springfield* case, and other specified and unspecified conduct—had monopolized the market for M–16 replacement parts and had organized a group boycott against Christianson. Christianson later added a second count alleging a state law claim of tortious interference with Christianson's business opportunities. Colt answered the complaint by denying that the actions it took to protect its trade secrets violated either the antitrust laws or the state laws against tortious interference and also cross-claimed against Christianson alleging tortious interference with its own business opportunities as well as various other trade practice violations by Christianson. Christianson countered that defense by asserting that Colt had no valid trade

secrets to defend because the information alleged to be secret should have been disclosed in Colt's patent disclosures for the improvement parts in question.

Both sides filed motions for partial summary judgment. Christianson moved that Colt's trade secrets be declared invalid and asked for summary judgment on its tortious interference claim and two of Colt's counterclaims that were premised on the alleged trade secrets. Colt, in its cross-motion for summary judgment, asked the court to find that its patent disclosures were sufficient, and further asked that Christianson's tortious interference claim be dismissed.

The district court granted summary judgment for Christianson, not only as to trade secret invalidity and tortious interference, but as to all counts of the complaint. The court found that Colt's patents in the improvements at issue were invalid for failure to meet both the enablement and best mode requirements for patent validity found in 35 U.S.C. § 112.[5] According to the district court, the patents failed to meet the enablement requirement because, given the information contained in the patents, it would still be a massive undertaking to construct the inventions so that they would be interchangeable *in the M–16. Christianson v. Colt Industries Operating Corp.,* 609 F.Supp. 1174, 1178–79 (C.D. Ill. 1985). Moreover, the court found no evidence demonstrating that the patent disclosures were sufficient to permit one skilled in the art to make the inventions for use *in any rifle. Id.* at 1179.

The district court also held that the patents failed to meet the best mode requirement of § 112. The court believed that, given the standardization of the M–16 as the battlefield rifle of this country's armed forces and the need for perfect interchangeability among the parts of the rifle, the best mode of the improvement parts was for use *in an M–16.* However, be-

---

**5.** 35 U.S.C. § 112 states, in pertinent part, that:
[A patent] specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to

which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

cause the patents failed to disclose the specifications and tolerances within which the parts would be interchangeable with other M–16s, the court found that best mode disclosure was not made. In addition, the court rejected any suggestion that, even assuming the best mode was for use *in a rifle*, Colt had disclosed its preferred method of carrying out the inventions.

The district court next decided that Colt could not claim trade secret protection for the information that should have been disclosed. According to the court, the vindication of the policies underlying federal patent law require that state trade secret law be preempted to the extent that state law would protect information that should have been the subject of patent disclosure. *Christianson*, 609 F.Supp. at 1183. The court stated that "[a] state may not apply its own laws in such a way as would extend the monopoly of an expired or invalid patent or afford any protection which is inconsistent with the objectives of the federal patent laws." *Id.* The district court did not stop at trade secret invalidation, however, but continued on to grant relief to Christianson which had neither been sought nor briefed in the motions for summary judgment. First, the district court ordered Colt to disgorge *all* of its trade secrets relating to the M–16, whether those trade secrets were related to the patents at issue or not. *Christianson v. Colt Industries Operating Corp.*, 613 F.Supp. 330, 331 (C.D. Ill.1985). Second, the court granted summary judgment to Christianson on both count I, the antitrust count, and count II, the tortious interference count. *Christianson*, 609 F.Supp. at 1185.

Colt appealed the district court's decision to the Court of Appeals for the Federal Circuit. Jurisdiction in that court was premised on the theory that this case turned almost completely on a matter of patent law. In an unpublished order, the Federal Circuit granted Christianson's motion to transfer the case to the Seventh Circuit on the ground that the Federal Circuit lacked jurisdiction. The Seventh Circuit, *sua sponte*, transferred the appeal back to the Federal Circuit. A panel of

this court held that the case arose under the patent laws of the United States, for which appellate jurisdiction was lodged exclusively in the Federal Circuit. *Christianson v. Colt Industries Operating Corp.*, 798 F.2d 1051 (7th Cir.1986).

A panel of the Federal Circuit reaffirmed its original decision that only the Seventh Circuit had jurisdiction over the appeal. Nevertheless, Chief Judge Markey, the author of the Federal Circuit decision, recognized that without a decision on the merits, this appeal could volley back and forth between the circuits *ad infinitum*. Thus, "in the interests of justice," the Federal Circuit reached the merits of the appeal and reversed. *Christianson v. Colt Industries Operating Corp.*, 822 F.2d 1544 (Fed. Cir.1987). The reasons relied upon by the Federal Circuit in reversing the judgment of the district court will be discussed below.

The Supreme Court, in order to settle the jurisdictional question in the case, granted certiorari and held that the Seventh Circuit has jurisdiction over this appeal. *Christianson v. Colt Industries Operating Corp.*, — U.S. —, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988). According to the Court, the proper jurisdictional inquiry is whether patent law either creates the cause of action or is a necessary element to each of the claims set out in the complaint, in which case the Federal Circuit would have exclusive jurisdiction, or whether some claim in the complaint relies on theories outside the patent law, in which case the regional circuits would have jurisdiction. *Id.* 108 S.Ct. at 2174.

In this case, the Court found that patent law was not a necessary component of some of the theories supporting the claims arguably raised by the complaint:

Examination of the complaint reveals that the monopolization theory that Colt singles out (and on which the petitioners ultimately prevailed in the District Court) is only one of several, and the only one for which the patent law is even arguably essential. So far as appears from the complaint, for example, petitioners

might have attempted to prove that Colt's accusations of trade-secret infringement were false not because Colt had no trade secrets, but because Colt authorized petitioners to use them.... In fact, most of the conduct alleged in the complaint could be deemed wrongful quite apart from the truth or falsity of Colt's accusations [against Christianson in the letters sent to suppliers]. According to the complaint, Colt's letters also (1) contained "copies of inapplicable court orders" and "suggest[ed] that these court orders prohibited [the recipients] from doing business with" petitioners; and (2) "falsely stat[ed] that 'Colt's right' to proprietary data had been 'consistently upheld in various courts.'" Similarly the complaint alleges that [Colt pursued the *Springfield* case against Christianson for] "reasons completely unrelated to the provisions and purposes" of federal patent law.

*Id.* at 2175. The Court went on to state that the same analysis could be applied to Christianson's group boycott claim:

Whether or not the patent-law issue was an "essential" element of th[e] group-boycott *theory* [that was actually litigated in the motion for summary judgment], however, petitioners could have supported their group-boycott *claim* with any of several theories having nothing to do with the validity of Colt's patents. Equally prominent in the complaint, for example, is a theory that the alleged agreement was unreasonable not because Colt had no trade secrets to protect, but because Colt authorized petitioners to use them.

*Id.* at 2175–76 (emphasis in original). Thus, because the antitrust claims made in Christianson's complaint could be supported with theories having nothing to do with patent law, jurisdiction over the appeal should have been taken by the Seventh Circuit. The Court, without commenting on the underlying reasoning of the Federal Circuit, concluded that the court's lack of jurisdiction compelled it "to disapprove of [the] decision to reach the merits anyway" and vacated the merits decision. *Id.* at 2178.

Secure in the knowledge that this court has jurisdiction, we finally reach the merits of Colt's appeal and find that we must (1) reverse the district court's judgment granting summary judgment to Christianson, and (2) remand the case to the district court for (a) entry of summary judgment for Colt on the issue of the adequacy of its patent disclosures, (b) disposition of the remaining summary judgment issues, and (c) proceedings on the non-patent based theories contained in Christianson's complaint.

## II.

■ Initially, we determine what weight, if any, to give to the merits decision of the Federal Circuit. As we discussed above, the Supreme Court vacated the Federal Circuit's decision on the ground that it was inappropriate for the Federal Circuit, in the interests of justice, to decide the merits of a case over which it did not have jurisdiction. Nevertheless, there is no indication that the Supreme Court found any error in the Federal Circuit's decision. Thus, although vacated, the decision stands as the most comprehensive source of guidance available on the patent law questions at issue in this case. *See County of Los Angeles v. Davis*, 440 U.S. 625, 646 n. 10, 99 S.Ct. 1379, 1391 n. 10, 59 L.Ed.2d 642 (1979) (Powell, J., dissenting) ("Although a decision vacating a judgment necessarily prevents the opinion of the lower court from being the law of the case, the expression of the court below on the merits, if not reversed, will continue to have precedential weight....") (citations omitted); *U.S. ex rel Espinoza v. Fairman*, 813 F.2d 117, 125 (7th Cir.), *cert. denied*, 483 U.S. 1010, 107 S.Ct. 3240, 97 L.Ed.2d 745 (1987) (decision vacated by Supreme Court remains persuasive precedent where Court did not reject the decision's underlying reasoning). Although we recognize that the Federal Circuit's decision does not bind us, the comprehensive nature of the decision, along with the recognition that Congress created the Federal Circuit with the goal of achieving uniformity and coherence in the patent laws, *see Christianson v. Colt Industries Operating Corp.*, 822 F.2d 1544, 1551 (Fed.

Cir.1987), counsel us against straying far from the court's thorough analysis of the difficult issues presented by this case.

With that in mind, the first substantive issues we must decide are whether the district court erred in finding that Colt failed to meet the enablement and best mode requirements of § 112. We review *de novo* the district court's determination of a summary judgment motion, *Commercial Union Ins. v. Ramada Hotel Operating Co.*, 852 F.2d 298, 300 (7th Cir.1988), and use the same standard of decisionmaking as that employed by the district court. *Id.* Thus, we will affirm the grant of summary judgment only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The burden is on the moving party to support the motion for summary judgment and, where that has been achieved, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). If we determine that the district court did err, under these standards, with respect to the validity of Colt's patents, we must then determine if there is any reason to return this case to the district court for further proceedings.

## A. Enablement

■ A patent is enabling when the disclosures made in the patent application are sufficient to allow a person skilled in the art to make and use the claimed invention. *Spectra–Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1532 (Fed.Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 346, 98 L.Ed.2d 372 (1987). The requirement is designed to ensure that the subject matter of the claimed invention is generally in the possession of the public and ready to be reproduced following the expiration of the patent period. *Id.* To determine whether the disclosure is enabling, a two-part analysis is employed. First, we must delimit the scope of the *claimed* invention. *DeGeorge v. Bernier,* 768 F.2d 1318, 1323–24 (Fed. Cir.1985); *Plastic Container Corp. v. Continental Plastics,* 607 F.2d 885, 897 (10th Cir.1979), *cert. denied,* 444 U.S. 1018, 100

S.Ct. 672, 62 L.Ed.2d 648 (1980). Second, we must look to the disclosures made in the patent to ascertain whether, given that level of disclosure, a person skilled in the art could successfully reproduce the claimed invention in its entire scope. *DeGeorge,* 768 F.2d at 1324. Because only the claimed invention receives patent law protection, the disclosures need generally be no greater than the claim. *Technicon Instruments v. Alpkem Corp.,* 664 F.Supp. 1558, 2 USPQ 2d 1729, 1742 (D.Or.1986). If the invention can be reproduced in its entire scope, then the patent specifications are enabling.

■ In this case, the parties hotly contest the issue of the scope of the inventions. Christianson alleges that the inventions are improvements to parts specifically made for an M–16 rifle. As such, Christianson believes that the scope of the inventions includes the ability to use the inventions with every M–16 in existence—*i.e.,* to make the parts "interchangeable." To make the parts in each patent interchangeable, Colt would have had to have disclosed the specifications and tolerances which permit interchangeability. The district court, in granting summary judgment to Christianson, expressly adopted this analysis.

Colt, on the other hand, takes the position that the inventions have nothing to do with the M–16. Colt points out that the patent claims mention neither the M–16 nor interchangeability as features of the inventions. Thus, Colt believes the claims are simply for rifle parts and would delimit the scope of the invention without regard to the ability of the invention to interact with the M–16.

Christianson answers Colt's argument by pointing out that the Federal Circuit has held that the scope of the invention can sometimes exceed the claim actually made in the patent. *White Consolidated Industries, Inc. v. Vega Servo–Control,* 713 F.2d 788 (Fed.Cir.1983). In *White,* the invention at issue was for a system which controlled the operations performed by automated machinery through the use of a computer program. A key problem for the invention

was to translate the language of the computer into a language that the machinery would understand and respond to. At the time the invention was patented, the only language translator available was a computer program called SPLIT, which was a trade secret of the Sundstrand Corporation, White's predecessor in interest. The Federal Circuit, while recognizing that the language translator was not claimed as part of the invention, nevertheless held that the failure to disclose its identity violated the enablement requirement of § 112. According to the court, the translator should have been disclosed since "it [was] an *integral part* of the disclosure necessary to enable those skilled in the art to 'make and use the same.'" *Id.* at 791 (emphasis added); *compare International Telephone and Telegraph Corp. v. Raychem Corp.*, 538 F.2d 453, 460 (1st Cir.1976), *cert. denied*, 429 U.S. 886, 97 S.Ct. 238, 50 L.Ed.2d 167 (1976) (no need to disclose compound which was not claimed to be part of the invention and was not "essential to the production of the patented" invention).

We think that *White* is inapposite to the facts of this case. The disclosure of SPLIT was required because it was an "integral part" of the invention—the invention would not work, even if all other information was disclosed, without disclosure of the program. In the instant case, the specifications and tolerances are not an "integral part" of the inventions. The inventions will work in a rifle, assuming all the other information about the inventions is disclosed, without any data regarding the specifications and tolerances required for commercial utilization of the inventions in the M–16. *See DeGeorge*, 768 F.2d at 1324 (claim as to circuitry to be interfaced with word processor was enabling where there was disclosure of "detailed, *claimed* circuitry without requiring detailed disclosure of all related, *unclaimed* circuitry [in the word processor] with which TCCPI might be interfaced") (emphasis in original). Thus, the scope of Colt's inventions cover only the claims actually made, claims involving *rifle* parts, and do not cover the specifications and tolerances required to

interchange the inventions with M–16s already in existence.

We now reach the second step of the enablement inquiry, which requires us to determine, given the scope of the inventions, whether sufficient information has been disclosed to allow a person skilled in the art to make and utilize the inventions. Christianson claims, in regard to this part of the analysis, that there is no evidence that enough information was supplied to enable one skilled in the art to use the inventions in *any* weapon. Christianson argues that the deposition testimony of Colt's own witnesses support this contention. First, Christianson points to the testimony of Harold Waterman, Colt's Manager of Product Engineering for the Firearms Division, to the effect that at least one of the inventions, the bolt assist, could not have been used in any rifle given the information provided in the patent. Second, Christianson recites the testimony of Seth Bredbury, Colt's expert witness, who testified in the context of the *Springfield* case that it would be a "massive task" to reverse engineer the inventions at issue to make them interchangeable with M–16s already in existence. Christianson admits that Bredbury later testified that the inventions could be incorporated into firearms without undue experimentation, but claims that that testimony has no factual support and is refuted by his earlier testimony.

The district court also pointed to this testimony from Waterman and Bredbury to support its conclusion that the patent disclosures were non-enabling. The district court found that Bredbury's statement that "'undue experimentation' would not be required is not substantiated by any statement of fact." *Christianson v. Colt Industries Operating Corp.*, 609 F.Supp. 1174, 1179 (C.D.Ill.1985). The district court went on to find that "[t]here is no evidence that *any* weapon other than the Colt weapons could or do use any of the inventions." *Id.* (emphasis added).

The federal circuit found, and we agree, that the district court's finding in regard to use in weapons other than the M–16 was unsupported by the record. *Christianson,*

822 F.2d at 1561. First, and most important, Christianson's counsel acknowledged at oral argument that these inventions could be made for use in rifles; counsel's only claim was that they could not be made for use in the M–16. Second, the plaintiff has misconstrued the testimony of Waterman. Waterman did not testify that the bolt assist could not be used in a weapon, given the information provided in the patent, but instead simply opined that even one skilled in the art could not build an *entire weapon* given only the information about one part.[6] Third, there is no inconsistency between Bredbury's statements in the *Springfield* case and his deposition statement here. It is undisputed that it would be a massive task to reverse engineer the parts so that they would be interchangeable with all other M–16s. But that is not inconsistent with Bredbury's testimony that the patent disclosures enable one skilled in the art to put the inventions to use in some other rifle that does not require interchangeable parts. Thus, no evidence in the record supports the plaintiff's assertion, accepted by the district court, that the information provided by Colt in the patents was non-enabling with respect to the *claimed* inventions. Instead, we agree with Colt that the unrebutted evidence shows that the patent disclosures for the claimed inventions were enabling.

### B. Best Mode

Section 112 requires that "the specification ... set forth the best mode contemplated by the inventor of carrying out the invention." Thus, if the applicant develops specific instrumentalities or techniques which are recognized as the best way to carry out the invention, then the best mode requirement obliges the applicant to disclose that information. *Spectra–Physics*, 827 F.2d at 1537. The requirement contains a subjective standard; we will find non-compliance only if the patentee has concealed, whether knowingly or unwittingly, *his or her* preferred embodiment of the claimed invention. *DeGeorge*, 768 F.2d at 1324; *Spectra–Physics*, 827 F.2d at 1535. Again, the focus of the best mode requirement, as it was with the enablement requirement, is on the *claimed* invention. *Randomex Inc. v. Scopus Corp.*, 849 F.2d 585, 588 (Fed.Cir.1988); *Plastic Container Corp.*, 607 F.2d at 897.[7]

---

**6.** The complete exchange between Mr. Waterman and Christianson's attorney was as follows:

Q: Let me ask, would it be possible to make an M16 by reference to this patent 3,236,155 [the bolt assist]?
A: No.
Q: Do you think you could make a weapon that would have incorporated the bolt assist simply by the use of these drawings and this text and the exercise of ordinary skill?
A: By the use of this only? No.

. . . . .

Q: Would your answer be the same to the question if you had tools that would be available to people of ordinary skill in this field, but if you didn't have any of Colt's proprietary, alleged proprietary tools or gauges?

. . . . .

A: Let me ask this. You're going to use this document [the patent disclosures for the bolt assist]?
Q: Yes.
A: No other document?
Q: No, but you will have available to you everything that a gun manufacturer of ordinary skill in the gun manufacturing business would have, but that wouldn't include any secret, proprietary gauges that we have been talking about that Colt may have or drawings that Colt may have.

. . . . .

A: It isn't interchangeable?
Q: The question wouldn't require interchangeability.
A: It isn't functional or it is functional?
Q: It would have to be a functional weapon.

. . . . .

A: Well, for example, this document does not refer to caliber. This document does not refer to a cartridge. If one was to take this document and I have no idea that the document is to scale or what caliber or anything about it, I would have to say that the use of this document, no, you could not. You could get an idea of the mechanism, and that would just about be it.

**7.** In *Plastic Container Corp.*, the defendant in a patent infringement action alleged that the plaintiff's disclosures in its patents for prescription drug containers were inadequate for failure to meet the best mode requirement. In a previous action involving the plaintiff, a court had determined that the plaintiff's disclosures did not satisfy the best mode requirement with respect to the container and the defendant claimed that that determination should be given collateral estoppel effect. Following the court's original determination, the plaintiff reapplied

Thus, before determining whether there is evidence of concealment, the scope of the invention must be delimited.

█ The district court in this case, again adopting the plaintiff's analysis, determined that the scope of the claims involve inventions which are "fully interchangeable with the corresponding part in every M–16 ever produced." *Christianson*, 609 F.Supp. at 1181. The district court then went on to find that Colt failed to disclose the best mode of using those inventions because it omitted the specifications and tolerances necessary to make the parts interchangeable with M–16 rifles already in existence. However, as we discussed above in relation to the enablement requirement, the district court erred in its definition of the scope of the inventions. Nowhere in the claims is it stated that these inventions purport to be interchangeable with every M–16 ever produced or that the inventions have anything to do with the M–16 at all. The inventions are improvements to parts used in a rifle, any rifle, and we will look to those inventions to determine if the inventor has concealed his or her preferred embodiment.

Given that the claimed inventions involve parts for rifles, without specifying any particular brand of rifle, the district court's determination that Colt failed to disclose the best mode for using these inventions was unsupported by the record. The Federal Circuit succinctly outlined the district court's error as follows:

> The best mode requirement assures that inventors do not conceal the best mode known to them when they file a patent

application, but the "best mode" is that of practicing the *claimed* invention. *It has nothing to do with mass production or sales to customers having particular requirements. (emphasis added) [See Indecor, Inc. v. Fox–Wells, Inc., 642 F.Supp. 1473, 1490 (S.D.N.Y.1986)].* In this case, interchangeability with M–16 parts appears nowhere as a limitation in any claim, and as Christianson concedes, the patents make no reference whatever to the M–16 rifle. Thus the best mode for making and using and carrying out the *claimed inventions* does not entail or involve either the M–16 rifle or interchangeability. The "best mode" for making and using the claimed parts relates to their use in *a* rifle, any rifle. There is nothing anywhere in the present record indicating that any of the patents fail to meet that requirement.

*Christianson*, 822 F.2d at 1563 (emphasis in original except where otherwise noted). Thus, because this case is unlike cases where the best mode requirement has not been fulfilled because of some sort of concealment—*e.g., Union Carbide Corp. v. Borg–Warner Corp.*, 550 F.2d 355 (6th Cir. 1977); *Dana Corp. v. IPC Limited Partnership*, 860 F.2d 415 (Fed.Cir.1988) (disclosure in patent for valve stem seal inadequate where flouride surface treatment not disclosed; tests showed that the surface treatment was "necessary" to satisfactory performance of the seal)—we find no evidence in the record to support the district court's determination that Colt failed to disclose its preferred embodiment of these inventions.[8] Again, the evidence of record

for a patent for the container and a patent was issued. The Tenth Circuit refused to give collateral estoppel effect to the previous decision because the defendant overlooked the fact that in reapplying for a patent, the plaintiff changed the scope of the invention. Since the features the defendant claimed should have been disclosed were features only of the original claim, and not of the invention at issue in the case at bar, the court found that the best mode requirement was fulfilled.

**8.** Christianson objects, quite understandably, that if Colt can validly claim trade secret protection, it will be able to protect its commercial products from competition even after the expi-

ration of its patents. Christianson points out, and we agree, that the best mode requirement is intended to allow the public to compete fairly with the patentee following the expiration of the patents. *See Phillips Petroleum Co. v. Sid Richardson Carbon & Gasoline Co.*, 293 F.Supp. 555, 558 n. 2 (N.D.Tex.1968) ("[T]he price an inventor must pay for his seventeen year patent monopoly is a disclosure of the invention which would enable persons skilled in the pertinent art to practice it."). While we sympathize with Christianson's frustration in being unable to compete with Colt, and Christianson may yet prove that Colt has violated the antitrust laws, for the reasons discussed we cannot vindicate

shows that Colt *did* disclose the best mode of carrying out its inventions.

## III.

■ The district court held that Colt could claim no protection under state trade secret law for the specifications and tolerances necessary to make the improvement parts interchangeable with existing M–16 rifles. The only ground cited by the district court for the invalidation of the trade secrets was that Colt should have disclosed those specifications and tolerances in its patent applications pursuant to the enablement and best mode requirements. Yet, as we discussed above, the district court erred in finding that Colt failed to meet the enablement and best mode requirements. Thus, the district court erred in granting summary judgment to Christianson on the issue of trade secret invalidity. Moreover, everything that followed from the district court's trade secret decision, including the requirement that Colt disgorge all of its trade secrets in the M–16 and the grant of summary judgment on the antitrust and tortious interference claims, must be vacated.

The district court also erred in denying that part of Colt's motion for summary judgment asking the court to declare that its patent disclosures were adequate. As discussed above, the non-moving party, to avoid summary judgment, must set forth specific facts to show that there is genuine dispute about a material fact. *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 2511, 91 L.Ed.2d 202 (1986). In this case, Christianson has set forth no facts to exhibit a dispute about whether the enablement and best mode requirements, properly understood, were fulfilled by Colt's patents. Thus, because there are no genuine issues of material fact remaining on the issue of patent validity, summary judgment should be entered for Colt on that issue.

The case does not end there, however, for the district court must still determine whether Colt, Christianson, or neither is entitled to summary judgment on count II of Christianson's complaint. Christianson's complaint states that even if the patents are valid, Colt still cannot claim trade secret protection because Colt gave Christianson permission to make the parts.[9] If the district court should determine that Colt's 1976 permission did not extend to Christianson's actions at issue in this case, assuming that that issue is susceptible to determination on summary judgment, then the district court should enter summary judgment for Colt on Count II. If the district court determines that the permission does cover Christianson's actions, then the district court must decide if the other defenses Colt raises to the tortious interference claim, such as its good faith reliance on what it thought were valid trade secrets, have merit. It will be up to the district court to assess all of these issues, and any other issues properly raised in the summary judgment motions and not disposed of by this case, on remand.

## IV.

For all the reasons discussed above, we REVERSE the decision of the district court and REMAND for further proceedings not inconsistent with this opinion.

■

its attempt to rectify the situation through an attack on Colt's patent disclosures.

9. Christianson's complaint states that: "In 1976, prior to the expiration of said patents, ITS [International Trade Services] expended funds to have manufactured certain tooling to be used for the manufacture of M–16 parts and accessories.... Colt gave ITS permission to use the tooling for which it had expended funds in 1976 to the end that suppliers ... could make M–16 parts to sell to customers...."